**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 22-00399** |
| **MARQUISE WILLIAMS** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

On May 30, 2020, amidst civil disorder in Center City, Philadelphia, in the wake of the death of George Floyd, and while in the middle of a dense crowd of protestors, defendant Marquise Williams threw a lit road flare at a marked Pennsylvania State Police (PSP) vehicle. The vehicle, fortunately unoccupied, never became engulfed in flames; yet, it was later deemed to be a total loss for PSP as a result of its extreme physical damage and destruction by the rioters. For the reasons provided below, the government recommends a sentence of imprisonment at the low end of the applicable guidelines range.

## I. INTRODUCTION

The government submits this memorandum in advance of the sentencing hearing scheduled for November 1, 2023. On November 10, 2022, defendant Marquise Williams was charged by information with one count of knowingly committing acts, and aiding and abetting and attempting such acts, to obstruct, impede, and interfere with law enforcement officers lawfully engaged in the lawful performance of their official duties incident to and during the commission of a civil disorder, which obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce, in violation of 18 U.S.C. §§ 231(a)(3) and 2 (Count One). On December 21, 2022, waiving his right to prosecution by indictment, defendant Williams entered a plea of guilty, pursuant to a written plea agreement between the

parties, to Count One (civil disorder) of the information.

## II. SENTENCING CALCULATION

### A. Maximum Sentence

Count One (civil disorder): five-years' imprisonment, a three-year term of supervised release, a $250,000 fine, and a $100 special assessment. Pursuant to the plea agreement, the defendant agrees to pay mandatory restitution in the amount of $17,260.

### B. Sentencing Guidelines Calculation

The Probation Office calculated defendant Williams' total offense level as 24, after declining to apply a three-level reduction for acceptance of responsibility, pursuant to U.S.S.G § 3E1.1, due to the defendant's poor compliance with conditions of release in this matter. Combined with the defendant's Criminal History Category I, the preliminarily resulting Sentencing Guidelines range was determined by the Probation Office to be 51 to 63 months' imprisonment. Because the statutorily authorized maximum sentence of five years effectively capped the guideline range, the Probation Office's applicable Sentencing Guidelines range became 51 to 60 months' imprisonment. U.S.S.G. §5G1.1(c)(1). PSR ¶¶ 28-36. The defendant took issue with the Probation Office's denial of the application of the three-level reduction for acceptance of responsibility and subsequently filed an objection to the Presentence Report. PSR Appendix A.

In paragraph 10 of the defendant's written plea agreement, the parties' stipulated to the application of a three-level reduction for acceptance of responsibility, pursuant to USSG § 3E1.1(a) and (b). While we recognize that, pursuant to USSG § 6B1.4, such stipulations are not binding on either the Probation Office or the Court, the government stands by the parties' stipulation, respectfully asserting that the defendant's total offense level is 21, which results in an applicable

guidelines range of 37 to 46 months' imprisonment. The details of the government's calculation are as follows:

| | |
|---|---|
| Base Offense Level<br>U.S.S.G. § 2K1.4(a)(1) | 24 |
| Adjusted Offense Level | 24 |
| Acceptance of Responsibility<br>U.S.S.G. § 3E1.1(a), (b) | - 3 |
| Total Offense Level<br>Criminal History Category I | 21 |
| Sentencing Guideline Imprisonment Range: | 37 to 46 months. |

## III. SENTENCING ANALYSIS

A thorough consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a) counsels in favor of a sentence of imprisonment at the low end of the advisory range.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A. Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

On May 25, 2020, George Floyd died while in the custody of the Minneapolis, Minnesota, Police Department. The circumstances surrounding George Floyd's death drew significant media attention. In the days following Floyd's death, large-scale protests were held throughout the United States. One such protest took place on Saturday, May 30, 2020, in and around Center City, Philadelphia. PSR ¶ 12.

While initial protests in Philadelphia were peaceful, violence later erupted. Among other things, some groups of individuals began to riot, smashing store fronts, looting stores, and attacking police vehicles, including two PSP SUVs. That afternoon, PSP troopers responded to the intersection of Broad and Vine Streets, near an on-ramp for Interstate 676 (the "Vine Street Expressway"), based on a report of a large gathering of protesters. The PSP troopers responded to the area to prevent protestors from gaining access to I-676 and from endangering themselves and others by demonstrating on the highway and thus impeding motorists' travel. PSR ¶ 13.

Shortly thereafter, according to PSP troopers, other law enforcement and civilian witnesses, and video and photographic evidence, a group of individuals attacked two PSP

vehicles, both marked gray Ford Explorers designated as PSP Units K1-7 and K1-17, which the troopers had parked near the intersection to control the crowds. Individuals were seen hitting the PSP SUVs with various objects, including skateboards, a bike lock, and unknown projectiles, in addition to kicks and strikes from closed fists. Eventually, individuals shattered the windows of both PSP SUVs and stole PSP equipment stored inside, including road flares and other police equipment. One individual sprayed the rear area of SUV K1-17, inside and out, with a flammable liquid. PSR ¶ 13.

PSP troopers assigned to the area reported that individuals then threw lit road flares at, and in some cases, into, both police SUVs, K1-7 and K1-17. Road flares were thrown at and into K1-17, igniting the fire which engulfed that SUV. Due to the size of the crowd, fire personnel were unable to extinguish the fire, which destroyed SUV K1-17. One PSP trooper, who was standing near K1-17, was hit by a lit road flare, causing part of his uniform to catch fire and a burn to his hand. He was treated for his injuries on the scene. PSR ¶¶ 13-15.

Video and photographic surveillance captured defendant Marquise Williams, amidst the civil disorder, first holding a lit road flare, and then throwing it directly at the other police SUV, K1-7. Fortunately, K1-7 never became engulfed in flames and did not burn. It was, however, later deemed to be a total loss for PSP as a result of its extreme physical damage and destruction by the rioters. PSR ¶¶ 14-16.

On May 28, 2021, the Federal Bureau of Investigation ("FBI") issued a press release asking for the public's assistance in identifying certain unknown persons photographed defacing and/or destroying property during the Center City protests in late May and early June 2020. Shortly thereafter, on June 8, 2021, defendant Williams walked into the FBI's office in Philadelphia, explaining that he was turning himself in after family members had seen his photo

featured on an FBI flyer and then had urged him to “get ahead” of the situation. Defendant Williams identified himself to agents as an individual photographed tossing a lit road flare into PSP vehicle K1-7. Williams identified the distinctive clothing and face mask he was seen wearing in several of the photographs and videos, and he also claimed that he had forgotten exactly what he had done with the flare until viewing the photos. The defendant ultimately stated that he wanted to take responsibility for his actions. Defendant Williams further clarified that he had not attended the protest intending to cause damage or harm to anyone, but that he had gotten caught up in the moment. PSR ¶¶ 16-17.

At the time of his interview, the defendant also provided investigators with identifying information about his Facebook account, which allowed them to access video that he had publicly posted, showing protestors attacking the PSP vehicles. At one point in the approximate 1.5 hours of video, defendant Williams appeared to be holding a red road flare, which was not yet lit. A short time later, the flare was no longer visible, but a cloud of smoke appears in the frame. PSR ¶ 17.

Defendant Williams, 28 years old, is a United States citizen and a resident of Philadelphia. He has no known prior convictions, and one previous arrest in Florida for battery, for which the charges were dropped. The defendant is a high school graduate, has previously worked as a home health aide, and appears more recently to have been hired as a resident caregiver in a memory care facility, pending a successful background check and drug screenings. PSR ¶¶ 65-68.

Following the defendant’s guilty plea hearing on December 21, 2022, he was released on his own recognizance (with a $20,000 O/R bond) and has been under the supervision of Pretrial Services since that time. Within the first two months of his supervision, the defendant failed to

report on multiple occasions to Pretrial Services as directed, tested positive for marijuana numerous times, failed to report his new address, and admitted to using cocaine, marijuana, and ecstasy. During a bail revocation hearing on February 3, 2023, the defendant's conditions of release were modified to include placement at a recovery house (Gibson Foundation) and participation in drug treatment at the Northeast Treatment Center (NET), both in Philadelphia. On April 20, 2023, the Court held another bail revocation hearing, and permitted the defendant to remain on bail and to participate in the STRIDES program. PSR ¶¶ 7-10, 24-25, 51-53, 61-64.

On May 18, 2023, the defendant appeared before Honorable Elizabeth T. Hey, United States Magistrate Judge, in STRIDES court and was accepted into the program. Thereafter, however, he failed to appear on multiple occasions, and according to Pretrial Services, his participation in, and commitment to, the STRIDES program has been inconsistent. 18 U.S.C. § 3553(a)(1).

**B. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment and Adequate Deterrence, and Protect the Public**

Obstructing, impeding, and interfering with law enforcement officers lawfully engaged in the performance of their official duties incident to and during the commission of a civil disorder, which obstructs, delays, and adversely affects commerce and the movement of any article and commodity in commerce, is a serious offense. The defendant's act of throwing a lit flare into a police vehicle that was situated in an area densely populated with both law enforcement officers and protestors no doubt created a substantial risk of death and serious bodily harm to others.

A factor in the sentencing determination is both specific and general deterrence. As the courts of appeals have held both before and after *Booker*, deterrence under 3553(a) is not limited to deterrence of the particular defendant. *See e.g. United States v. Jordan*, 435 F.3d 693, 698

(7th Cir. 2006) (describing how Section 3553(a) "specifies that the court may consider the need for general deterrence and respect for the law"); *United States v. Glover*, 431 F.3d 744, 751 (11th Cir. 2005) (noting that pre-*Booker* and post-*Booker*, "the underlying goals of the statute and the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation marks omitted)); *see also United States v. Yeaman*, 248 F.3d 223, 232 (3d Cir. 2001) (referring to Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and rehabilitation").

Considering the nature and seriousness of the offense, a guidelines sentence is the best way to satisfy the objectives of § 3553(a). Such a sentence in this case will "reflect the seriousness of [the defendant's] offense . . . promote respect for the law . . . provide just punishment for the offense . . . protect the public from further crimes of the defendant . . . [and] afford adequate deterrence to [further] criminal conduct. . ." 18 U.S.C. § 3553(a)(2)(A), (B), and (C).

### C. The Need to Provide the Defendant with Educational or Vocational Training and Medical Care

There is no need in this case to adjust an otherwise appropriate sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner ...." § 3553(a)(2)(D). While serving an appropriate sentence, the defendant will have access to appropriate medical care, educational and/or vocational training, and counseling and treatment programs for mental health and substance abuse. Moreover, a three-year term of supervised release will also prove an efficient avenue for continued monitoring, and additional treatment, if warranted, of mental health and substance abuse issues. PSR ¶¶ 8-10, 25, 51-54, 59-64.

### D. The Need to Avoid Unwarranted Sentencing Disparities

The sentencing guidelines aim to achieve uniform and appropriate treatment of like crimes, represent the distillation of more than 20 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. All of these policy reasons support the imposition of a sentence of imprisonment within the applicable guideline range in this case. 18 U.S.C. § 3553(a)(6).

**E. The Need to Provide Restitution**

The provisions of the Mandatory Victim Restitution Act of 1996 apply to the offense of conviction in this matter. The Pennsylvania State Police, as an agency, is considered a victim. Pursuant to the guilty plea agreement entered into between the parties, the defendant has agreed to pay restitution in the amount of $17,260. PSR ¶¶ 18-21. 18 U.S.C. § 3553(a)(7).

## IV. CONCLUSION

For these reasons, the government recommends that the Court impose a sentence of imprisonment at the low end of the applicable guideline range in this case.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

*/s/ Christine E. Sykes*
CHRISTINE E. SYKES
VINEET GAURI
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this Sentencing Memorandum has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

Thomas F. Burke, Esquire
Two Penn Center Plaza
1500 John F. Kennedy Boulevard, Suite 900
Philadelphia, PA 19102

*/s Christine E. Sykes*
CHRISTINE E. SYKES
Assistant United States Attorney

Date: October 24, 2023.